UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN F. MIKAN, | ) | CASE NO. 5:15 CV 250 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| ARBORS AT FAIRLAWN CARE, LLC, | ) ) | |
| | ) | MEMORANDUM OF OPINION |
| Defendant. | ) | (Resolving Doc. #27) |

This matter is before the Court on Defendant, Arbors at Fairlawn Care, LLC's ("the Arbors"), motion for summary judgment as to Plaintiff's claim of interference under the Family and Medical Leave Act ("FMLA") (Count One). For the reasons that follow, the Arbors motion (Doc. #27) is GRANTED.

I.   **FACTS**

Plaintiff, Susan F. Mikan ("Mikan"), is a Registered Nurse ("RN") who worked at the Arbors facility as a part-time RN Supervisor.  On July 18, 2014, Ms. Mikan was working in that capacity for a shift beginning at 6 p.m. on July 18 and ending at 6 a.m. on July 19, in an area of the facility called the 600 Hall.  As an RN Supervisor, Ms. Mikan's duties while on shift included monitoring the residents on the hall; providing care; and informing other supervisors and physicians of the status of residents or changes in condition.  When Ms. Mikan's shift began

1

on July 18, 2014, two other supervisors were on duty: another RN Supervisor, Vicki Knotts, whose shift began at 3 p.m. and would end at 11 p.m., and a Unit Manager, Valerie Wallick, who was completing paperwork at the end of her day but was present when Ms. Mikan arrived. At approximately 7:00 p.m. on July 18, Ms. Mikan entered a resident's room to deliver a dinner tray. At that time she found the resident, Resident C[1], on the floor, between his bed and chair, without his oxygen feed. (Mikan Dep. Tr. 96-97.) He was confused and unable to explain how he came to be on the floor. (Mikan Dep. Tr. 97-98.) Ms. Mikan and other employees lifted Resident C back onto his bed and arranged for him to be moved closer to the nurses' station so he could be more easily monitored. (Mikan Dep. Tr. 103-104.)

The Arbors is aware that its residents are particularly vulnerable to falls. Due to the health status of the residents and the nature of the services provided by the facility, the Arbors has in place a Neurological Assessment Protocol, also referred to as a neuro check procedure, that employees must follow every time a resident has an unexplained fall. (Mikan Dep. Tr. 78, 84-85.) Ms. Mikan is aware of the procedure and its requirements, which include checking the resident's vital signs every fifteen minutes in the first hour after the fall until the resident is stable and then every thirty minutes for the next two hours, and if the resident remains stable, additional, less frequent, monitoring. (Mikan Dep. Tr. 80.) To facilitate compliance with the procedure, the Arbors maintains a "Neurological Assessment Flowsheet" which requires employees to enter data from each vital sign assessment after a fall. (Mikan Dep. Ex. M.)

If an employee observes a change in a resident's condition while monitoring the resident after an unexplained fall, the employee is required to immediately notify the resident's physician and a family or legal representative of the change. (Mikan Dep. Tr. 86.) Ms. Mikan was aware

---

[1] So designated by the parties to protect patient confidentiality.

2

of the notification requirement; the Clinical Administrative Manual, which states the underlying policy, is available to all staff. (Mikan Dep. Tr. 83-84, Ex. N.) For the purposes of the notification policy, the fall itself is not considered a change in condition that must be reported. A change must be reported after a fall only when the neuro check procedure reveals that vital signs after the fall differ from previously recorded vital signs. (Mikan Dep. Tr. 82.)

Resident C had arrived at the Arbors on July 16, 2014. According to his chart, which was available to all nursing personnel, his fully documented vital signs from the two days prior were consistent. (Mikan Dep. Tr. 108, 110, Ex. S,T.) After Resident C's fall on July 18, 2014, Ms. Mikan checked and documented his vital signs at approximately 7:00 p.m.. She did not conduct a check at 7:15 as required by the protocol. (Mikan Dep. Tr. 107, Ex. R.) She then checked the resident's vital signs at 7:30 p.m. but did not check his vital signs again until three hours later at 10:30 p.m.. Under the protocol, during that three hour period, she was required to make checks at 7:45; 8:00; 8:30; 9:00; 9:30; and 10:00 – if the resident had stabilized. At this point, Ms. Mikan waited another two and a half hours, until 2:00 a.m., before she checked Resident C's vital signs again. During her deposition, Ms. Mikan admitted that she did not compare Resident C's post-fall vital signs to those previously recorded in his chart. (Mikan Dep. Tr. pp. 108-127.)

At 2:00 a.m., Resident C's vital signs showed insufficient oxygen and Ms. Mikan recognized that he had become hypoxic. She then, for the first time, attempted to contact his physician. When she could not reach the physician, she called 911. (Mikan Dep. Tr. p. 120.) At 2:25 a.m., she contacted Resident C's family/legal representative. At 2:40 a.m., Resident C was taken by ambulance from the Arbors to the hospital, where he went into cardiac arrest and died shortly after arrival.

3

According to the Arbors, with regard to Resident C, Ms. Mikan's failure to follow the neuro assessment protocol was compounded by her failure to properly respond to the 7:00 p.m. vital signs check, which indicated that Resident C had undergone a significant change in condition, triggering the notification requirement.  (Yoho Dep. Tr. 50-51.)  The 7:00 p.m. entry in the neuro flow chart, immediately after the fall, reflects a decrease in Resident C's blood oxygen level from the 92% recorded in his chart at 4:00 p.m. to 84%; his blood pressure had increased from 122/67 to 137/94; and his pulse had increased from 87 to 120.  (Mikan Dep. Ex S, R.)  The Arbors states that these changes were significant and triggered the notification requirement.  (Yoho Dep. Tr. 49-54.)   According to the Arbors, this significant change in condition was evident again in the 7:30 p.m. vital signs and repeated at 10:30 p.m. in the form of reduced oxygen levels and elevated pulse.  Thus, under the Arbors policy, notification of the resident's physician and family/legal representative was required at 7:00 p.m. and continued to be required for approximately seven hours before it actually occurred, after 2 a.m..

At 4:50 a.m. on July 19, 2014, Ms. Mikan completed and submitted an electronic Resident Incident Report, which generated a report to the Regional Director of Operations, Chris Warrick.  (Mikan Dep. Ex. V.)  The Regional Director responded to the report on July 19, 2014, with emails to Administrator, Monica Agee, and the Director of Nursing, Kathie Yoho, asking why no one was called about the incident.  Both women received the emails when returning to work on Monday, July 21, 2014.

On July 21, 2014, Ms. Wallick, the Unit Manager, supplemented the Resident Incident Report completed by Ms. Mikan by interviewing and taking statements from other staff members on duty at the time.  The supplemented report was submitted to the Arbors' corporate office. At the same time, Ms. Yoho began a separate investigation into the care received by Resident C at

4

the Arbors. Later that day, Ms. Wallick and Ms. Yoho interviewed Ms. Mikan together to take a statement concerning her shift on July 18–July 19. According to the supervisors, during the interview, Ms. Mikan said she was just "real busy" and did not have time to notify the physician and that she was sorry she "dropped the ball" and failed to follow the neuro check procedure, but that she was just "too busy." (Yoho Aff. App. 1; Yoho Dep. Tr. 53; Agee Dep. Tr. 30-31; Wallick Aff. App.1.) Ms. Yoho told Ms. Mikan on July 21, 2014 that she was suspended pending the completion of the investigation. (Yoho Dep. Ex. 15; Agee Dep. Tr. 41.)

Ms. Wallick, Ms. Yoho, and Ms. Agee, conducted a review of July 18 and 19. Over the next six or seven days they determined that they would recommend termination of Ms. Mikan's employment as a result of the combined failures to comply with the neurological protocol and inform the physician of the change in condition. Ms. Agee and Ms. Yoho reviewed this recommendation with the Regional Director, Mr. Warrick, who agreed with the decision and authorized them to proceed. On July 28, 2014, Ms. Yoho prepared a Disciplinary Action Report to provide Ms. Mikan with notification of her termination; she then called Ms. Mikan to tell her that she did not need to come it to work because she was being terminated. (Yoho Dep. Tr. 61; Yoho Aff. ¶ 14; Mikan Dep. Tr. 154-55.)

Unknown to Ms. Yoho and Ms. Agee, also on July 28, 2014, Ms. Mikan called the Arbors' Business Office Manager, Marsha Marville, and asked for information about taking FMLA leave. According to the testimony of Ms. Agee, Ms. Marville routinely handled FMLA leave requests and other payroll and employee status issues. According to Ms. Marville, FMLA leave requests are common at the Arbors, especially for childbirth and other family related reasons, requests are considered routine, and employees regularly take FMLA leave from the Arbors and return to work at the Arbors without incident. (Marville Aff. ¶ 11 & 12; Marville

5

Dep. Tr. p. 83-84.)  Ms. Marville was not part of the investigations and termination decision; she was unaware, when she spoke to Ms. Mikan on July 28, 2014, that a decision concerning her employment status was forthcoming.  In response to her conversation with Ms. Mikan, Ms. Marville pulled FMLA forms and either prepared to mail them to her or posted them on a notice board for her to pick up when she came in.  (Marville Aff., ¶ 8; Dep. Tr. p. 35-41.)  After her conversation with Ms. Mikan and pulling the forms for her, Ms. Marville was informed by Ms. Yoho that Ms. Mikan was being terminated and instructed to prepare the forms necessary to remove her from the payroll system and compile an Employee Separation Report.  (Marville Aff., ¶8.)  Ms. Agee and Ms. Yoho state that they were not aware of Ms. Mikan's intention to take FMLA leave when investigating and deciding to terminate her employment.  (Agee Dep. Tr. p. 19-21, Yoho Dep. Tr. p. 12-15.)  Ms. Agee further explained in her deposition that FMLA leave was not "pertinent when we were investigating" and that she would not have expected to be informed of an FMLA request in the context of such an investigation because it was not relevant.  (Agee Dep. Tr. p. 23.)

     Ms. Mikan does not dispute the Arbors' description of July 18 and 19 or the timeline of her suspension and termination.  Ms. Mikan states that she informed a supervisor, Vicki Knotts, of the fall and that Ms. Knotts, along with other staff members, helped her lift Resident C back into his bed.  Ms. Mikan also states that Ms. Knotts was aware of her medical condition and potential need for FMLA leave – according to Ms. Knotts's testimony during her deposition she was aware that Ms. Mikan had a diagnosis, was contemplating surgery, and intended to use her sick leave for the surgery, but expected to need FMLA leave, as well, afterwards.  (Knotts Dep. Tr. p. 18-19.)  Ms. Knotts states that she was aware of the diagnosis before July 18, 2014.  (Knotts Dep. Tr. p. 18-19.)  Ms. Mikan argues, in essence, that her July 28, 2014 request to Ms.

Marville for FMLA paperwork was in fact her second FMLA request. Although Ms. Mikan contends in her brief that she first made her FMLA leave request to Ms. Knotts, prior to July 18 and her subsequent suspension and termination, neither her own, nor Ms. Knotts's deposition testimony confirms this assertion. According to Ms. Knotts's testimony, she has only a very general knowledge and awareness of the FMLA, and she would have referred anyone asking about FMLA leave to Marsha Marville, who handled all such requests and issued the necessary paperwork. (Knotts Dep. Tr. p. 19-24; 56-57.) Ms. Knotts was not part of the investigation and decision whether to terminate Ms. Mikan, she indicated that participation in either would not be part of her role at the Arbors. (Knotts Dep. Tr. p. 58.) Ms. Knotts further stated that although in her experience as a supervisor she had reviewed neurological assessment sheets with "a spot somewhere that hasn't been filled," she could not recall ever seeing another neurological assessment sheet with three hour gaps like those that occurred in Resident C's assessment. (Knotts Dep. Tr. p. 67-69.) Ms. Knotts confirmed during her deposition that she did not tell anyone else about Ms. Mikan's medical condition or possible need for FMLA leave after having exhausted her sick leave and that she would have referred any FMLA issue to Ms. Marville. (Knotts Dep. Tr. p. 57-58.)

Ms. Mikan described the circumstances surrounding her request for leave during her deposition as follows:

> Q What are you claiming the defendant did wrong?
>
> A Well, I asked for Family Leave, the papers. I had never filled out those papers before. I didn't know what it entailed. So I called Marsha [Marville] who was in HR and she told me she would have to get back to me.
>
> …
>
> Q . . . I want you to tell me everything the defendant did that you claim violated the Family Medical Leave Act.

7

> A   Well, I asked Marsha [Marville] to tell me what I needed to do and did I need to come in and she said she would get back to me, and in a matter of time, I'm not sure what amount of time lapsed, maybe an hour or so, that's when Kathy Yoho called me back and said I was terminated.-
>
> . . .
>
> Q   Prior to the occasion you have described for us when you talked to Marsha [Marville] about the forms, had you ever asked for FMLA before at the Arbors?
>
> A   No.

(Mikan Dep. Tr. p. 9-10; 19.)  Ms. Mikan further described her conversations with Ms. Knotts:

> Q   Other than what appears to have been a very brief telephone discussion with Marsha [Marville], did you talk to anyone else at Arbors about any type of family or medical leave?
>
> A   Vicki Knotts.  She was my supervisor.  I did mention to her that something was going on.  I wasn't sure exactly what would transpire, but I was going to the doctor and they found something and I conveyed that to her.
>
> Q   When did you have this conversation with Vicki Knotts?
>
> A   I can't tell you exactly . . . In the month of July is when I was having all of the tests that were being run, and when I would come to work, I would mention – you know, because she wasn't there every day that I worked, but on the days she was there, I did mention to her that something was happening.  At the time, I thought . . . that [it] would be a matter of a couple days, but as time went on, I found out I was going to have to have surgery and I didn't know the date until after the 22nd of July.

(Mikan Dep. Tr. p. 22-23.)  When asked to clarify when she discussed surgery with Ms. Knotts, Ms. Mikan explained "Not until after I knew, I knew for sure on the 16th [of July] that I would have surgery, and on the 22nd [of July] his office called me with a date. . . It would have to be after the 16th . . . after the 16th I knew for sure." (Mikan Dep. Tr. p.26.)  According to Ms. Mikan's description of her schedule, it appears that her shift on July 18-19, 2014 was the first shift she worked after her July 16, 2014 appointment.

8

## II. LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Estate of Smithers v. City of Flint*, 602 F.3d 758, 761 (6th Cir. 2010). A fact must be essential to the outcome of a lawsuit to be 'material.' *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Summary judgment will be entered when a party fails to make a "showing sufficient to establish…an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23. "Mere conclusory and unsupported allegations, rooted in speculation, do not meet [the] burden." *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).

Summary judgment creates a burden-shifting framework. See *Anderson*, 477 U.S. 250. The moving party has the initial burden of showing there is no genuine issue of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). Specifically,

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed.R.Civ.P. 56(c)(1).

The burden then shifts to the nonmoving party to prove that there is an issue of material fact that can be tried. *Plant,* 212 F.3d at 934. If this burden is not met, the moving party is then entitled to a judgment as a matter of law. *Bell*, 351 F.3d at 253. When evaluating a motion for

9

summary judgment, the Court construes the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party may not simply rely on its pleadings; rather it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1996). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II. LAW AND ANALYSIS

The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). It is unlawful "for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). Employers who violate § 2615 are "liable to any eligible employee affected" for damages and appropriate equitable relief. 29 U.S.C. § 2617(a)(1).

Under the Act, employees are required to provide the employer "at least 30 days advance notice before FMLA leave is to begin if the need for the leave is foreseeable based on . . . [a] planned medical treatment for a serious health condition." 29 CFR § 825.302 (a). Employees are further required under the Act to "consult with the employer and make a reasonable effort to schedule [their planned medical] treatment so as not to disrupt unduly the employer's operations,

subject to approval of the health care provider." 29 CFR § 825.302(e).  Where an employee is unable to provide the full 30 day notice, notice is required "as soon as is practicable" based on the circumstances of the individual case.  29 CFR § 825.302 (b).  The notice the employee shall provide should be "at least" "verbal notice sufficient to make the employer aware that the employee needs FMLA qualifying leave, and the anticipated timing and duration of the leave." 29 CFR § 825.302 (c).  Finally, an employer may require, absent unusual circumstances, that notice be made in compliance "with the employer's usual and customary notice and procedural requirements for requesting leave."  29 CFR § 825.302(d).  These requirements may include specifying the individual to whom notice must be provided.  29 CFR 825.302 (d)   Employers may further specify that requests for leave must be made in written notice setting forth the reasons for requested leave; the anticipated duration of the leave; and the anticipated start of the leave.  29 CFR § 825.302 (d).  Failure to comply with an employer's requirements may result in delay or denial of leave under the Act.  29 CFR § 825.302 (d).

Ms. Mikan alleges that the Arbors interfered with her rights under the FMLA by failing to provide notices required by the Act and by terminating her employment after she made an FMLA leave request.  To succeed in her FMLA-interference claim, Ms. Mikan must demonstrate that: (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the Arbors notice of her intention to take leave; and (5) the Arbors denied her FMLA benefits to which she was entitled. *Cavin v. Honda of Am. Mfg., Inc.,* 346 F.3d 713, 719 (6th Cir. 2003).

When a request for leave is made, the FMLA requires three specific notices: (1) the Eligibility Notice, which must be provided, absent extenuating circumstances, within five business days of an employee request for FMLA leave or an employer acquiring knowledge that

an employee's leave may be for an FMLA-qualifying issue; (2) a Rights and Responsibilities Notice, explaining the specific expectations and obligations of the employee and explaining of the consequences of a failure to meet the obligations; and (3) a Designation Notice, informing the employee, within five days, when the employer has enough information to determine whether leave is FMLA eligible that the leave will be designated and counted as FMLA leave. 29 CFR § 825.300 (b)(1); (c)(1); (d)(1). Under 29 CFR § 825.300(e) "Failure to follow the notice requirements set forth in this section may constitute an interference with" an employee's FMLA rights. The penalties for failure to notify may include liability "for compensation and benefits lost by reason of the violation, for other actual monetary losses sustained as a direct result of the violation, and for appropriate equitable or other relief, including employment, reinstatement, promotion or any other relief tailored to the harm suffered." 29 CFR § 825.300(e).

The parties do not dispute the first three elements of the *Cavin* test. Ms. Mikan appears to be an eligible employee of an employer covered by the FMLA who may be entitled to FMLA benefits. The remaining issue is when Ms. Mikan gave notice of her intention to take FMLA leave and whether the alleged failure to provide notice and subsequent termination of her employment was in any way an interference with or motivated by her intention to take leave. With regard to notice, Ms. Mikan argues that her conversations with Ms. Knotts were sufficient to constitute notice triggering reciprocal responsibilities for notice from the Arbors under the Act. Taking every word of Ms. Mikan's deposition testimony on the subject as true, it is clear that the earliest opportunity on which she could satisfy the notice and timing requirements of the FMLA under 29 CFR § 825.302 was July 22, 2014, the date on which she learned when her surgery was scheduled. According to her deposition testimony, until the July 16 she thought she would only need a couple days leave for a more routine procedure; she learned for the first time

on July 16 that more extensive surgery would be necessary, but did not know until July 22 when the surgery would be. (Mikan Dep. Tr. p. 22-24; 26.) Thus, according to 29 CFR § 825.302(c), Ms. Mikan could provide notice "sufficient to make the employer aware that the employee needs FMLA qualifying leave" including the "anticipated timing and duration of the leave" only after she was placed on suspension following the events of her shift on July 18-19. According to her own testimony, Ms. Mikan then made her request for FMLA paperwork to Ms. Marville on July 28, 2014. Taking Ms. Mikan's testimony alone, it is clear there was no failure to provide required notices prior to her first discussion with Ms. Marville concerning FMLA paperwork.

When Ms. Mikan's testimony is read in the context of Ms. Marville's, it becomes clear that the Arbors "usual and customary notice and procedural requirements" for requesting leave included written notice, as is permitted under the Act. 29 CFR § 825.302(d). During Ms. Marville's, deposition she describes a distinction made by the Arbors between requesting FMLA paperwork and requesting FMLA leave. (Marville Dep. p. 69-73.) Ms. Marville explained that only after the employee returns the paperwork can she learn what leave the person is actually requesting, whether it is leave from work or intermittent leave, the duration of the leave, and other information necessary to process the request. (Marville Dep. p. 69-73.) Ms. Marville further explained that supervisors would only be informed about an FMLA leave request after she received the paperwork back from the employee and was able to inform the supervisor when the employee would be taking leave. (Marville Dep. Tr. p. 82.) Thus, it is clear from the record, and Ms. Mikan's own testimony, that Ms. Mikan made no protected, written, FMLA leave request, including timing and duration pursuant to 29 CFR § 825.302, prior to the termination of her employment with the Arbors.

With regard to Ms. Mikan's allegation that her termination was retaliatory and intended to interfere with her rights under the FMLA, there is simply no evidence in the record that supports such a finding. According to the deposition testimony of Ms. Mikan and Ms. Marville, among others, FMLA requests were a matter of routine at the Arbors, employees regularly took leave under the Act, and returned from leave without incident.  According to the deposition testimony of those involved in the termination decision, they had no knowledge of a possible request for FMLA leave and the possibility of such a request was entirely irrelevant to the termination decision.  In the absence of a protected request for leave and any indication that a potential need for FMLA leave was a factor in the termination decision, Ms. Mikan's sole remaining argument is the alleged "suspicious timing" of her termination after her request to Ms. Marville for FMLA paperwork.  *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir.2012).  As Ms. Mikan acknowledges in her brief, any "suspicious timing" must be accompanied by "some other, independent evidence" because temporal proximity "cannot be the sole basis for finding pretext." *Id.*  Construing all evidence in the record in favor of Ms. Mikan, this record offers no independent evidence of pretext.  Accordingly, this Court finds summary judgment in favor of the Arbors is the only appropriate result.

### IV.   CONCLUSION

For the reasons set forth herein, Defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

                                                        */s/ John R. Adams*
                                             JUDGE JOHN R. ADAMS
                                             UNITED STATES DISTRICT COURT

**DATED**: SEPTEMBER 28, 2016